UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Mary Hitchcock Memorial Hospital
d/b/a Dartmouth-Hitchcock

    v.                                    Civil No. 15-cv-453-LM
                                              Opinion No. 2014 DNH 080
Hal Cohen, Secretary,
Vermont Agency of Human Services;
Sylvia Mathews Burwell, Secretary,
U.S. Department of Health and Human Services;
Andrew Slavitt, Acting Administrator,
Centers for Medicare and Medicaid Services, and
Centers for Medicare and Medicaid Services


O R D E R


Mary Hitchcock Memorial Hospital d/b/a Dartmouth-Hitchcock

("D-H") brings suit against the Vermont Agency of Human

Services, the United States Department of Health and Human

Services ("HHS"), and the Centers for Medicare and Medicaid

Services ("CMS"), challenging the rate of reimbursement to D-H

for Medicaid covered services provided to Vermont patients and

the decision not to make other Medicaid payments to D-H.[1]  The

---

[1] As provided in the caption, the complaint names as
defendants the Secretary of the Vermont Agency of Human
Services, the Secretary of the United States Department of
Health and Human Services, and the Acting Administrator of the
Centers for Medicare and Medicaid Services, along with the
Centers for Medicare and Medicaid Services.  Because the suit is
brought against the public officials in their official
capacities only, as the secretaries and administrator of
government agencies, the defendants are deemed to be the
government agencies rather than the named officials.  Kentucky
v. Graham, 473 U.S. 159, 165 (1985); Surprenant v. Rivas, 424
F.3d 5, 19 (1st Cir. 2005).

Vermont Agency of Human Services ("Vermont") moves to dismiss D-H's claims and moves for judicial notice of documents filed in support of the motion.  HHS and CMS, the federal defendants, also move to dismiss the claims against them.  D-H objects to the motion for judicial notice and both motions to dismiss.

I.  Motion for Judicial Notice

Vermont filed a motion asking the court to take judicial notice, pursuant to Federal Rule of Evidence 201, of twenty-seven exhibits it relied on to support its motion to dismiss. In support, Vermont incorporates by reference a footnote in its memorandum in support of its motion to dismiss that addresses when extrinsic materials may be considered for purposes of deciding a motion to dismiss.  D-H objects to the motion for judicial notice on the grounds that Vermont has not made the showing necessary under Rule 201 and asserts that D-H cannot adequately respond to the request.  Vermont then filed a reply, long after the deadline, responding to the deficiencies in its motion with a general reference to its memorandum in support of the motion to dismiss.

Rule 201 permits the court to take judicial notice of an adjudicative fact if the fact "is generally known within the trial court's territorial jurisdiction; or [] can be accurately and readily determined from sources whose accuracy cannot

2

reasonably be questioned." Fed. R. Evid. 201(b).  If a party

provides the court with necessary information, the court must

take judicial notice of the asserted fact.  Fed. R. Evid.

201(c)(2).

     In its motion, Vermont does not ask for judicial notice of

any adjudicative fact.  Instead, Vermont appears to seek

judicial notice that the twenty-seven documents it appended to

the motion are official public records.  Anticipating a positive

response, Vermont relied on the documents in support of its

motion to dismiss.

     "On a motion to dismiss, a court ordinarily may only

consider facts alleged in the complaint and exhibits attached

thereto, or else convert the motion into one for summary

judgment." Freeman v. Town of Hudson, 714 F.3d 29, 35-36 (1st

Cir. 2013) (internal citation omitted); see also Fed. R. Civ. P.

12(d).  A narrow exception to that rule exists for "documents

the authenticity of which are not disputed by the parties;

official public records; documents central to plaintiffs' claim;

and documents sufficiently referred to in the complaint."

Freeman, 714 F.3d at 36 (alteration and internal quotation marks

omitted).  Official public records must satisfy the requirements

of Rule 201 to be considered for purposes of a motion to

dismiss.  Id.

Vermont does not explain in its motion how the twenty-seven documents satisfy the requirements of Rule 201 or how they qualify as official public records.  In its reply, Vermont suggests that D-H and the court review its memorandum in support of the motion to dismiss to glean the information required by Rule 201.  As such, Vermont has not properly supported its motion to show that the documents are official public records, and the court declines to undertake that analysis based on Vermont's general reference to the motion to dismiss memorandum. The motion is denied.

II.  <u>Motions to Dismiss</u>

D-H brings claims under 42 U.S.C. § 1983 that Vermont is violating both the dormant Commerce Clause and the Equal Protection Clause by imposing, through amendments to the Vermont Medicaid Plan, a reimbursement and payment scheme that favors in-state hospitals and disadvantages out-of-state hospitals.[2] D-H brings claims against the federal defendants that the amendments must be set aside under the Administrative Procedures Act ("APA") 5 U.S.C. § 706(2)(A) and (B), because the federal defendants allowed Vermont to violate the dormant Commerce Clause, the Equal Protection Clause, and 42 C.F.R. § 431.52(b).

---

[2] Section 1983 provides a cause of action against state actors who deprive a person of "of any rights, privileges, or immunities secured by the Constitution and laws."

4

Vermont moves to dismiss the claims against it, and the federal defendants move to dismiss the claims against them.

A.  Standard of Review

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court assumes the truth of the properly pleaded facts and takes all reasonable inferences from the facts that support the plaintiff's claims.  Mulero-Carrillo v. Roman-Hernandez, 790 F.3d 99, 104 (1st Cir. 2015). Conclusory statements in the complaint that merely provide the elements of a claim or a legal standard are not credited for purposes of a motion under Rule 12(b)(6).  Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013).  Based on the properly pleaded facts, the court determines whether the plaintiff has stated "a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

B. Background

In accord with the standard of review, the background information is summarized from the complaint, with a brief preliminary explanation of the Medicaid program.

1. Medicaid Program

"Congress created the Medicaid program in 1965 by adding Title XIX to the Social Security Act."  Pharm. Research & Mfrs.

5

of Am. v. Walsh, 538 U.S. 644, 650 (2003).  The Medicaid Act establishes a cooperative federal and state program to provide payment for medical services to the poor, elderly, and disabled. 42 U.S.C. § 1396, et. seq.  A state that opts into the Medicaid program is required to submit a Medicaid Plan for review and approval.  Wilder v. Virgina Hosp. Ass'n, 496 U.S. 498, 502 (1990).

Congress delegated the process of Medicaid Plan approval to the Secretary of HHS.  42 U.S.C. § 1396a(b).  CMS administers the provisions of the Medicaid Act on behalf of HHS, including reviewing Medicaid Plans.  Mayhew v. Burwell, 772 F.3d 80, 82 (1st Cir. 2014).  A Plan must include, among other things, "'a scheme for reimbursing health care providers for the medical services provided to needy individuals.'"  New Hampshire Hosp. Ass'n v. Burwell, No. 15-cv-460, 2016 WL 1048023, *1 (D.N.H. Mar. 11, 2016) (quoting Wilder, 496 U.S. at 502).  A state may later change the Plan by submitting an amendment to CMS for approval.  Mayhew, 772 F.3d at 82.

### 2.   Factual Background

D-H is located in Lebanon, New Hampshire, less than ten miles from the Vermont border.  Because of its location, D-H provides medical services to Vermont residents, including Vermont Medicaid patients.  D-H participates in Vermont's

Medicaid program and is the second largest volume provider of services to Vermont Medicaid patients, with the University of Vermont Medical Center being first.

D-H operates an academic medical center, a children's hospital, and a cancer center.  D-H includes a Level I Trauma Center, serves as a tertiary care provider, and qualifies as a "sole community hospital."  D-H provides the same or similar levels of care and services to Vermont Medicaid and uninsured patients as are provided by Vermont hospitals, including the University of Vermont Medical Center.

Through its Department of Vermont Health Access ("DVHA"), Vermont reimburses D-H for hospital services provided to Vermont Medicaid patients.  Since November of 2013, DVHA has reimbursed the University of Vermont Medical Center for inpatient hospital services at the base rate of $7,611.45.  During the same period, DVHA has reimbursed D-H at the base rate of $5,224.80.  The low base rate paid by DVHA for inpatient services has caused D-H a yearly shortfall of approximately $7,000,000.00.  Outpatient treatment rates for out-of-state hospitals are also lower than the rates for Vermont hospitals.

Vermont's Medicaid Plan precludes certain other payments to out-of-state hospitals.  While DVHA makes Disproportionate Share Hospital ("DSH") payments to Vermont hospitals, it does not make

7

those payments to D-H.  In addition, DVHA makes teaching hospital payments to the University of Vermont Medical Center but does not make those payments to D-H, although D-H is also a teaching hospital.

CMS has approved the Vermont Medicaid Plan and amendments that provide lower reimbursement rates and preclude certain other payments to out-of-state hospitals.

C.  Discussion

D-H's claims against Vermont are brought under § 1983 and allege that the amendments to Vermont's Medicaid Plan that impose the reimbursement and payment scheme violate the dormant Commerce Clause and the Equal Protection Clause.  D-H's claims against the federal defendants, HHS and CMS, are brought under the APA and seek to set aside the approvals of the amendments that impose the reimbursement and payment scheme.[3]  D-H alleges that through approving the amendments, the federal defendants have violated 5 U.S.C. § 706(2)(A) and (B) by allowing Vermont to violate a Medicaid implementing regulation, 42 C.F.R. §

_____

[3] To the extent the federal defendants may have intended to challenge under the APA the viability of D-H's claims that arise from Vermont's alleged violation of the dormant Commerce Clause and Equal Protection Clause, such challenge has not been sufficiently developed to allow review here.  See Higgins v. New Balance Athletic Shoe, 194 F.3d 252, 260 (1st Cir. 1999).

431.52(b), the dormant Commerce Clause, and the Equal Protection Clause.[4]

The defendants acknowledge that Vermont's reimbursement and payment scheme pays less to out-of-state hospitals, including D-H, than is paid to Vermont hospitals.  Vermont moves to dismiss D-H's claims on the grounds that, although discriminatory, the reimbursement and payment scheme does not violate the dormant Commerce Clause or the Equal Protection Clause.  The federal defendants move to dismiss, arguing that their approval of the amendments to Vermont's Plan, which impose the discriminatory scheme, did not allow Vermont to violate § 431.52(b), the dormant Commerce Clause, or the Equal Protection Clause.

The defendants' motions to dismiss both address D-H's claims that Vermont's reimbursement and payment scheme violates the dormant Commerce Clause and the Equal Protection Clause.  To avoid unnecessary repetition, those shared issues are addressed

---

[4] Under § 706, a "reviewing court shall—(2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege, or immunity."  In making that determination, the court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning . . . of the terms of an agency action." § 706.

together.  The federal defendants also raise additional grounds in support of their motion, which are addressed separately.

### 1.  Dormant Commerce Clause

The Constitution's Commerce Clause gives Congress the power to regulate commerce among the states.  U.S. Const. art. I, § 8, cl. 3.  The Commerce Clause also includes "a further, negative command, known as the dormant Commerce Clause." Comptroller of Treasury of Md. v. Wynne, 135 S. Ct. 1787, 1794 (2015).  "[T]he dormant Commerce Clause precludes States from discriminating between transactions on the basis of some interstate element." Id. (alteration and internal quotation marks omitted).  "The Dormant Commerce Clause does not, however, apply to state or local regulations directly authorized by Congress." United Egg Producers v. Dep't of Agric. of P.R., 77 F.3d 567, 570 (1st Cir. 1996).  "Thus, state or local jurisdictions operating under 'Congressional consent' are free to enact laws burdening interstate commerce." Id.

The Medicaid Act does not expressly allow states to adopt reimbursement and payment schemes that are less favorable to out-of-state providers of Medicaid services.  Vermont contends, nevertheless, that Congress has consented to its Medicaid hospital reimbursement and payment scheme by granting states flexibility in developing reimbursement and payment rates and

through CMS's approval of Vermont's Plan and amendments.  The federal defendants also contend that the approval process shows Congressional consent to Vermont's scheme.  D-H argues that neither the legislative history Vermont cites nor the approval process demonstrates the Congressional consent that is necessary to avoid the dormant Commerce Clause.

Although states may enact laws that burden interstate commerce and that would otherwise be barred by the dormant Commerce Clause when Congress consents to interstate regulation by the state, the standard for showing Congressional consent is high.  United Egg, 77 F.3d at 570.  To avoid the dormant Commerce Clause, a state must show that Congress "expressly stated" its consent to the contested law or made its consent "unmistakably clear."  Id.; see also Wyoming v. Oklahoma, 502 U.S. 437, 458 (1992).

a.  Flexibility

Vermont argues, relying on Wilder, 496 U.S. at 505-06, that Congress consented to unequal reimbursement and payment rates in states' Medicaid Plans by passing the Boren Amendment to the Medicaid Act.  The Boren Amendment was intended to provide states with more flexibility "to develop methods and standards for reimbursement" to control inflation in medical costs. Wilder, 496 U.S. at 505.  Vermont notes that in passing the

11

Boren Amendment Congress explained "that States would be free to establish statewide or classwide rates."  Id. at 506.  From that statement, Vermont infers Congressional consent to Medicaid rates that favor in-state hospitals.

As D-H points out, however, neither the Medicaid Act nor the Boren Amendment, which was repealed in 1997,[5] allows states to impose Medicaid rates that favor in-state hospitals over out-of-state hospitals.  42 U.S.C. § 1396a(a)(16) states:

> [a] State [Medicaid] plan for medical assistance must--
> . . . provide for inclusion, to the extent required by
> regulations prescribed by the Secretary, of provisions
> (conforming to such regulations) with respect to the
> furnishing of medical assistance under the plan to
> individuals who are residents of the State but are absent
> therefrom; . . . ."

The implementing regulation for § 1396a(a)(16) states:  "A State plan must provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a beneficiary who is a resident of the State, and any of the following conditions is met . . . ."  42 C.F.R. § 431.52(b).  The four conditions are that the out-of-state medical services are needed because of an emergency, to avoid

---

[5] "The Amendment was repealed in 1997, after substantial lobbying efforts by states seeking greater latitude in setting their rates."  Christ the King Manor, Inc. v Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 308 n.21 (3d Cir. 2013).

endangering the beneficiary's health, because they are more available out-of-state, or it is the "general practice" to use out-of-state resources.  Id.  In addition, §§ 1396r-4(b) and (d) define DSH for purposes of DSH payments without reference to a hospital's in-state or out-of-state location.

Other courts have found no expression of Congressional support for unequal Medicaid rates in the Medicaid Act, including the Boren Amendment.  See Children's Hosp. & Health Ctr. v. Belshe, 188 F.3d 1090, 1096 (9th Cir. 1999) (interpreting the Boren Amendment to show Congress's intent not to differentiate between in-state and out-of-state hospital services); W. Va. Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 28-29 (3d Cir. 1989) ("Nothing in § 1396a(a) [governing state plans] speaks in terms of a dichotomy in rate reimbursement built on state boundary lines; it nowhere suggests that state boundary lines act as points of demarcation in reimbursement for the delivery of health care.").

Vermont has not shown that the repealed Boren Amendment, its legislative history, or any other part of the Medicaid Act demonstrates Congressional authorization of Medicaid hospital reimbursement and payment schemes that favor in-state hospitals over out-of-state hospitals.

b.   Approval by CMS

Alternatively, Vermont and the federal defendants argue
that because Vermont's Medicaid Plan and amendments to the Plan,
which include the hospital reimbursement and payment scheme,
have been approved by CMS, Congress has consented to that
scheme.  In support, the defendants rely on Merrion v. Jicarilla
Apache Tribe, 455 U.S. 130 (1982).  D-H contends that Merrion is
inapplicable to the circumstances of this case.

In Merrion, non-members of the Jicarilla Apache Tribe, who
leased land on the Jicarilla reservation, challenged a tribal
ordinance that imposed a severance tax on the oil and gas they
were removing from tribal lands.  Id. at 133.  The Supreme Court
held that the tribe had inherent power to impose the tax on non-
members of the tribe.  Id. at 149.  The Court also held that the
dormant Commerce Clause did not bar the tax because "Congress
has affirmatively acted by providing a series of federal
checkpoints that must be cleared before a tribal tax can take
effect" and the tribal tax at issue in the case had been
"enacted in accordance with this congressional scheme."  Id. at
155.  The Court further explained that "Congress is well aware
that Indian tribes impose mineral severance taxes such as the
one challenged by [the] petitioners . . . [and Congress] retains
plenary power to limit tribal taxing authority or to alter the

14

current scheme under which the tribes may impose taxes." Id. at 156.

The defendants argue that the approval process required by the Medicaid Act provides federal checkpoints, as in Merrion, and that CMS has approved Vermont's hospital reimbursement and payment scheme through those checkpoints.  In support, Vermont states that CMS has "frequently and explicitly acknowledged Vermont's practice of targeting higher reimbursement levels to in-state hospitals and found this consistent with the intended meaning and scope of the Medicaid Act."[6]  As a result, the defendants assert, the dormant Commerce Clause does not apply to the reimbursement and payment scheme.

D-H responds that the Medicaid review and approval process does not provide the series of federal checkpoints that were considered and approved in Merrion.  D-H also argues that in the absence of an unmistakably clear expression of Congressional intent to allow Vermont's reimbursement and payment scheme, the

---

[6] Although Vermont cites no evidence to support that statement, it likely refers to letters from CMS to the Vermont Agency of Human Services approving certain amendments to Vermont's Medicaid Plan that are discussed in the factual background section of Vermont's memorandum.  Because the court has denied Vermont's motion for judicial, the letters are not before the court for purposes of the motion to dismiss.

discrimination against out-of-state hospitals violates the

dormant Commerce Clause.

The Medicaid review and approval process operates as

follows:

> To qualify for federal funds, States must submit to a
> federal agency (CMS, a division of the Department of
> Health and Human Services) a state Medicaid plan that
> details the nature and scope of the State's Medicaid
> program.  It must also submit any amendments to the
> plan that it may make from time to time.  And it must
> receive the agency's approval of the plan and any
> amendments.  Before granting approval, the agency
> reviews the State's plan and amendments to determine
> whether they comply with the statutory and regulatory
> requirements governing the Medicaid program.

Douglas v. Indep. Living Ctr. of S. California, Inc., 132 S. Ct.

1204, 1208 (2012).  42 U.S.C. § 1396a(a) provides a long list of

requirements, along with "an extensive body of regulations"

implementing the requirements, that must be met by a state

Medicaid Plan.  Alaska Dep't of Health & Soc. Servs. v. Ctrs.

for Medicare & Medicaid Servs., 424 F.3d 931, 935 (9th Cir.

2005).

The eighty-one requirements listed in § 1396a(a) begin with

the geographic scope of a state plan, the minimum amount of

state participation in the plan, and certain administrative

process and procedures for the plan.  The statute also includes,

among other things, requirements and standards for program

eligibility, access to coverage, determining legal liability of

third parties for health care costs, institutions providing care under the plan, claims procedures, providing information about services to eligible persons in the state, and measures to deal with fraud and false claims.  Section 1396a(b) prohibits age requirements of more than sixty-five years, exclusion of state residents, and exclusion of any citizen of the United States.

A state's Medicaid Plan must be approved if it satisfies the requirements listed in § 1396a(a).  § 1396a(b); see also Alaska Dep't, 424 F.3d at 935.  The parties have not pointed to either a requirement listed in § 1396a(a)or a prohibited condition in § 1396a(b) that addresses rates of reimbursements and payments to out-of-state hospitals.

There is no dispute that Vermont's Plan and the amendments met the requirements listed in § 1396a(a) and did not impose a prohibited condition.  Therefore, under § 1396a(b), it appears that CMS was mandated to approve the Plan and its amendments without considering whether the reimbursement and payment scheme for out-of-state hospitals was discriminatory.  The focused and circumscribed nature of CMS's review under § 1396a(a) and (b), does not support the defendants' argument that the Medicaid review and approval process indicates Congress's consent to having states impose discriminatory rates and payments.

17

In contrast, the review process under the Indian Reorganization Act in Merrion required the agency to consider the tribe's imposition of taxes. "Under the Indian Reorganization Act, 25 U.S.C. § 476, 477, a tribe must obtain approval from the Secretary [of the Interior] before it adopts or revises its constitution to announce its intention to tax nonmembers." Merrion, 455 U.S. at 155. Further, taxation of mineral resources was a power Congress expected the tribe to exercise. Id. at 156. As a result, the review process in Merrion, as explained by the Supreme Court, represented Congress's direct action and consent to allow the tribe to tax nonmembers.

In a recent case, a federal district court confronted the same argument that the defendants assert here regarding the application of Merrion to a state's discriminatory reimbursement and payment scheme for out-of-state hospitals. See Asante v. Cal. Dep't of Health Care Servs., No. 14-cv-032226-EMC, 2015 WL 9269666 (N.D. Cal. Dec. 21, 2015). In Asante, the California Medicaid Plan provided lower rates for in-patient care provided by out-of-state hospitals than were paid to in-state hospitals and did not provide for DSH payments to out-of-state hospitals. Id. *3-*5. The court distinguished Merrion on the grounds that the inherent power of an Indian tribe to tax presented a

different issue than discriminatory Medicaid rates and that the CMS review and approval process was insufficient to show "that Congress expected or authorized states to discriminate in rate setting." Id. at *16.  The court in Asante also discussed and relied on Envtl. Tech. Council v. Sierra Club, 98 F.3d 774 (4th Cir. 1996).

In Sierra, the Fourth Circuit considered a dormant Commerce Clause challenge to South Carolina's regulatory scheme for hazardous waste disposal, which restricted the amount of waste entering South Carolina from out of state.  Id. at 780.  "South Carolina argue[d] that through delegating the authorization of state programs to the EPA [Environmental Protection Agency] under RCRA [Resource Conservation and Recovery Act] and CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act of 1980], Congress created a system of checkpoints for a state's hazardous waste program."  Id. at 782.  Relying on Merrion, South Carolina contended that "by providing the checkpoints, Congress has 'affirmatively' authorized the state laws because they are contained in an EPA-approved RCRA program and CAP [Capacity Assurance Plan]."  Id. at 782-83.

The Fourth Circuit rejected South Carolina's theory of Congressional authorization.  Id. at 783.  The court concluded that Merrion was distinguishable because of the tribal taxation

19

power, because Congress was aware that the tribe taxed non-members, and because "the tax had been expressly approved by the Secretary through the checkpoints established for such taxes." Id. at 784. "In contrast, here, [the Fourth Circuit stated] one cannot say that Congress expressly contemplated or authorized violations of the dormant Commerce Clause by states limiting access to their hazardous waste facilities when it enacted RCRA, CERCLA, and SARA [Superfund Amendments and Reauthorization Act of 1986]." Id. As a result, "no congressionally established 'checkpoints' expressly anticipate or authorize [South Carolina's] laws," and "the EPA has not expressly approved any of the contested South Carolina laws." Id.

The reasoning in Asante and Sierra is persuasive and supports the court's view, for purposes of the motion to dismiss, that the CMS review and approval process does not demonstrate Congressional consent to Vermont's discriminatory hospital reimbursement and payment scheme. Importantly, however, issues pertaining to the CMS review and approval process might be addressed more comprehensively in the context of summary judgment. For purposes of the motion to dismiss, the defendants have not shown that D-H fails to state a claim that Vermont's hospital reimbursement and payment scheme violates the dormant Commerce Clause.

### 2.   Equal Protection Clause

"The Fourteenth Amendment's Equal Protection Clause prohibits a state from treating similarly situated persons differently because of their classification in a particular group." Mulero-Carillo, 790 F.3d at 105-06.  When a plaintiff does not claim that selective treatment has violated a fundamental right or that it belongs to a protected group, selective treatment is reviewed under the rational basis test. Id. at 106.  "Under rational basis scrutiny, a classification will withstand a constitutional challenge as long as it is rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational." D'Angelo v. N.H. Supreme Court, 740 F.3d 802, 806 (1st Cir. 2014) (internal quotation marks omitted).

D-H alleges that Vermont's reimbursement and payment scheme is intentionally discriminatory against out-of-state hospitals, including D-H, in violation of the Equal Protection Clause of the Fourteenth Amendment.  D-H also alleges that the approvals by CMS of Plan amendments that permit the discriminatory scheme require the court to set them aside under § 706(2)(A) and (B). The parties agree that the rational basis standard controls the claims in this case.

a.   Vermont's Motion

In support of its motion to dismiss, Vermont argues that D-H is not similarly situated to Vermont hospitals and that Vermont's reimbursement and payment scheme is rationally related to the state's interest in controlling health care inflation. For those reasons, Vermont asserts that its hospital reimbursement and payment scheme does not violate the Equal Protection Clause.  D-H asserts that it is similarly situated to University of Vermont Medical Center and other Vermont hospitals that receive Medicaid reimbursements and payments and disputes that Vermont's discriminatory scheme is rationally related to Vermont's legitimate interest to control health care costs.

Vermont's arguments that D-H is not similarly situated to Vermont hospitals and that the reimbursement and payment scheme is rationally related to its legitimate interest in controlling health care costs are based on facts taken from materials extrinsic to the complaint.  The arguments also raise issues of Vermont health care policy and legislation that require further amplification.  Therefore, Vermont's challenge to D-H's equal protection claim would be better addressed in the context of summary judgment.

22

b.   The Federal Defendants' Motion

The federal defendants argue that Vermont's reimbursement and payment scheme is rationally related to Vermont's legitimate interest in using its tax dollars to benefit its own citizens by paying higher rates and making other payments only to Vermont hospitals.[7]  Specifically, the federal defendants argue that Vermont hospitals are more likely than out-of-state hospitals to employ Vermont residents, foster close ties with the community, and contribute to Vermont tax revenues.  They also argue that D-H is not within the jurisdiction of Vermont for purposes of the Equal Protection Clause.

In response, D-H contends that a state cannot impose discriminatory schemes to benefit its own citizens at the expense of out-of-state businesses and that the Vermont scheme is not rationally related to the stated goal.  Further, D-H contends that the stated purpose is irrational because D-H serves more Vermont Medicaid beneficiaries than any Vermont hospital except University of Vermont Medical Center.  D-H also asserts that it is within the jurisdiction of Vermont for purposes of the Equal Protection Clause.

---

[7] In their reply, the federal defendants explain that they do not accept that D-H is similarly situated to Vermont hospitals and instead argue that because D-H is located outside of Vermont, and therefore not similar to Vermont hospitals, Vermont has a legitimate reason to treat D-H differently.

(1) Rational Basis Review

Rational basis review is satisfied if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification."[8] F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). A classification "bear[s] a strong presumption of validity" and "may be based on rational speculation unsupported by evidence or empirical data." Id. at 314-15. Nevertheless, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985).

In summary,

"[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational."

Fitzgerald v. Racing Ass'n of Central Iowa, 539 U.S. 103, 107 (2003) (quoting Nordlinger v. Hahn, 505 U.S. 1, 11-12 (1992)).

A party challenging the constitutionality of the classification

---

[8] For this reason, it is permissible for Vermont and the federal defendants to advance different bases for Vermont's discriminatory scheme.

bears the burden of refuting the bases for it.  Heller v. Doe by Doe, 509 U.S. 312, 320 (1993).

### i.  Legitimate State Interest

In arguing that a scheme intended to benefit a state's economy at the expense of out-out-state businesses is not a legitimate state interest, D-H relies on Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869 (1985) ("MetLife"), where insurance companies located outside of Alabama challenged a state tax on insurance premiums that favored Alabama companies.  Alabama argued that the discriminatory tax did not violate equal protection because it promoted the domestic insurance industry. Id. at 876.  The Supreme Court rejected that justification:

> In whatever light the State's position is cast, acceptance of its contention that promotion of domestic industry is always a legitimate state purpose under equal protection analysis would eviscerate the Equal Protection Clause in this context.  A State's natural inclination frequently would be to prefer domestic business over foreign.  If we accept the State's view here, then any discriminatory tax would be valid if the State could show it reasonably was intended to benefit domestic business.  A discriminatory tax would stand or fall depending primarily on how a State framed its purpose—as benefitting one group or as harming another.  This is a distinction without a difference, . . . .  We hold that under the circumstances of this case, promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose.

Id. at 883 (footnote omitted).[9]  Based on that analysis, D-H contends that Vermont cannot discriminate against it in order to benefit its own hospitals.

The federal defendants rely on Reeves, Inc. v. Stake, 447 U.S. 429 (1980), and Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel, 20 F.3d 1311, 1323 (4th Cir. 1994), to show that when a state is conferring benefits, as opposed to extracting taxes, it may favor in-state entities at the expense of out-of-state entities.  In Reeves, the court considered whether a cement plant owned by South Dakota could limit its sales to South Dakota businesses without violating the Commerce Clause.  447 U.S. at 433.  The Court rejected arguments of protectionism in holding that the South Dakota scheme did not violate the Commerce Clause.  Id. at 442-46.

The federal defendants do not explain how the analysis of South Dakota's limit on cement sales under the Commerce Clause applies to an analysis of Vermont's discriminatory reimbursement

---

[9] In Trojan Techs., Inc. v. Com. of Pa., 916 F.2d 903, 915 (3d Cir. 1990), the Third Circuit stated that the Supreme Court limited MetLife to its facts in Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys., 472 U.S. 159 (1985).  To the contrary, the Court explained in Northeast Bancorp that the states there were not favoring local corporations, as in MetLife, and that the banking issues raised in Northeast Bancorp "are of profound local concern." Id. at 177.  Therefore, the Court appeared to limit Northeast Bancorp to its banking context.

and payment scheme under the Equal Protection Clause.  Instead, they rely on a statement in Reeves that South Dakota's limit on sales to in-state businesses, along with other state programs that are limited to residents, "reflect the essential and patently unobjectionable purpose of state government – to serve the citizens of the State." Reeves, 447 U.S. at 442.  Nothing in Reeves, however, holds that a state may discriminate against out-of-state businesses to benefit their own economies or citizens without violating the Equal Protection Clause.

In Smith Setzer, a North Carolina company challenged a South Carolina statute that provided preferences for South Carolina products in procurement bidding.  20 F.3d at 1315.  The Fourth Circuit noted that state discrimination based on state boundaries "sharpens our concern into the legitimacy of the line-drawing enterprise." Id. at 1323.  The court concluded, nevertheless, that the bidding preferences were motivated by a legitimate state purpose to use funds from the treasury of South Carolina, which were derived from taxes, to benefit local producers and vendors.  Id.

The Fourth Circuit stated that it did not accept an interpretation of MetLife that prohibits states from articulating a legitimate state purpose in providing benefits to its citizens while excluding citizens from other states. Smith

Setzer, 20 F.3d at 1321.  The court explained that such a rule "would raise serious questions regarding the ability of a state to limit to its own residents the receipt of various benefits that are presently considered to be at the core of state-government responsibility."  Id. (relying on the Commerce Clause analysis in Reeves).

The federal defendants contend that the reasoning in Smith Setzer applies here because the preferential procurement process at issue in Smith Setzer conferred a benefit on in-state businesses analogous to the higher reimbursement rates and additional payments made to Vermont hospitals under the Medicaid Plan.  They argue that the rule in MetLife applies only when a state imposes the burden of a tax on out-of-state businesses.

Whether the equal protection analysis is different for extracting taxes from outsiders versus providing benefits to residents, the circumstances here are not analogous to those in Smith Setzer.  Smith Setzer involved South Carolina's decision to buy South Carolina goods from South Carolina vendors.  20 F.3d at 1314.  Under the Medicaid Act, Vermont is required by federal law to pay out-of-state hospitals for services provided to Vermont Medicaid beneficiaries.  42 U.S.C. § 1396a(a)(16).  The issue presented here is whether Vermont can pay less to out-of-state hospitals than it pays to Vermont hospitals for

Medicaid services based on a stated goal of benefitting its own citizens.

In addition, the funds used to buy South Carolina goods in Smith Setzer were South Carolina tax dollars.  Importantly, the funds used to pay for services provided to Vermont Medicaid beneficiaries are from both Vermont tax revenues and federal tax revenues.  Therefore, Vermont's reimbursement and payment scheme does not just preserve Vermont tax dollars for Vermonters but also provides more federal funds to Vermonters.  See W. Va. Hosps., 885 F.2d at 28 ("The State is not merely exercising discretion in how to spend its own money; medicaid funds derive in large part from the federal government.  Nothing in [the Medicaid Act] remotely suggests that a state may use federal funds to give its own hospitals preferential treatment and, at the same time, disadvantage out-of-state hospitals.").

As the Supreme Court explained in MetLife, if providing a benefit to a state's own businesses is always a legitimate state interest, any discrimination under the rational basis test "could be justified simply on the ground that it favored one group at the expense of another."  470 U.S. at 882, n.10. Therefore, based on MetLife, D-H has sufficiently shown, for purposes of surviving the motion to dismiss, that Vermont's goal of using its own resources to benefit its citizens by paying

less to out-of-state hospitals and more to in-state hospitals is
not a legitimate state interest.

    ii. <u>Rational Relationship</u>

In addition, D-H challenges the rationality of the link
between the discriminatory reimbursement and payment scheme and
Vermont's goal to use Vermont tax money to benefit Vermonters.
As is noted above, because the Vermont Medicaid program is
funded by both the federal government and Vermont, the
relationship between Vermont tax dollars and the payments made
to hospitals that provide Medicaid services is more complex than
South Carolina's preferential procurement plan in <u>Smith Setzer</u>.
In addition, D-H provides services to a significant number of
Vermont Medicaid beneficiaries, so that payments to D-H arguably
benefit Vermont residents.  See <u>W. Va. Univ. Hosps., Inc. v.
Rendell</u>, No. 1:CV-06-0082, 2007 WL 3274409, at *7 (M.D. Pa. Nov.
5, 2007).  Further, given its location close to Vermont, D-H
also likely employs Vermont residents, who pay Vermont taxes.

Based on the information available at this early stage,
even if a state has a legitimate interest in benefitting its own
citizens with preferential Medicaid reimbursements and payments
to in-state hospitals, Vermont's discriminatory scheme does not
appear to be rationally related to that interest.  Therefore,
for purposes of the motion to dismiss, D-H sufficiently alleges

that Vermont's reimbursement and payment scheme violates equal
protection.

### (2)   Within the Jurisdiction of Vermont

The federal defendants also contend that D-H does not come
within the jurisdiction of Vermont for purposes of equal
protection.  The Equal Protection Clause of the Fourteenth
Amendment prohibits a state from "deny[ing] any person within
its jurisdiction the equal protection of the laws." U.S. Const.
amend. XIV, § 1.  They argue that because D-H is not a Vermont
hospital and did not allege that it is subject to the
jurisdiction of Vermont, D-H's claim fails.

The federal defendants rely on Blake v. McClung, 172 U.S.
239 (1898), to show that D-H is not within the jurisdiction of
Vermont.  In Blake, the Supreme Court held that a Virginia
company was not within the jurisdiction of Tennessee for
purposes of the Equal Protection Clause when the "corporation
[was] not created by Tennessee, nor doing business there under
conditions that subjected it to process issuing from the courts
of Tennessee at the instance of suitors." Id. at 261.

D-H responds that it is within the jurisdiction of Vermont
because it participates in Vermont's Medicaid program and
because it is subject to the jurisdiction of Vermont's courts
under Vermont's long-arm statute.  In support, D-H cites Hughes

v. Alexandria Scrap Corp., 426 U.S. 794 (1976), where a Virginia corporation which participated in a Maryland licensing, penalty, and bounty program to rid the state of abandoned automobiles charged that an amendment to the program favored Maryland scrap processors in violation of the Commerce Clause and the Equal Protection Clause.  For purposes of the Equal Protection Clause claim, the Court found that Alexandria Scrap was within the jurisdiction of Maryland because it was licensed in Maryland, maintained an office there as required by the bounty program, and was subject to the jurisdiction of Maryland courts under the long-arm statute.  Id. at 810 n.21.

Although D-H is located in New Hampshire and does not maintain an office in Vermont, it is subject to the regulations and requirements of Vermont's Medicaid Plan and is also subject to the jurisdiction of Vermont courts.  Under these circumstances, D-H has shown that it is subject to the jurisdiction of Vermont for purposes of the Equal Protection Clause.

(3) 42 C.F.R. § 431.52

D-H alleges that a Medicaid implementing regulation, § 431.52(b), requires state Medicaid Plans to pay for services provided by out-of-state hospitals to that state's Medicaid beneficiaries at the same rates as paid to in-state hospitals.

Because Vermont's Plan, as amended, provides lower reimbursement rates to out-of-state hospitals for services to Vermont Medicaid beneficiaries, D-H contends that the Plan does not comply with § 431.52(b).  For that reason, D-H argues that the approvals by CMS of the amendments to the Vermont Plan, which establish the lower out-of-state reimbursement rates, are unlawful, and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

The federal defendants move to dismiss the claim, arguing that D-H misunderstands § 431.52(b).  They contend that, properly understood, § 431.52(b) guarantees a Medicaid beneficiary's right to services from out-of-state providers but does not require a specific rate of payment to out-of-state providers.  In other words, the federal defendants interpret § 431.52(b) as addressing coverage for Medicaid beneficiaries seeking services in other states rather than the rate of payment to a provider for those services.

As part of the Medicaid program, states are required to provide services to eligible residents when they are outside of the state.  42 U.S.C. § 1396a(a)(16).  Section 431.52 establishes "[t]he conditions under which payment for services is provided to out-of-State residents." 42 C.F.R. § 435.403(a).  Specifically, § 431.52(b) requires:

> A State plan must provide that the State will pay for services furnished in another State to the same extent that

it would pay for services furnished within its boundaries
if the services are furnished to a beneficiary who is a
resident of the State, and any of the following conditions
is met:

(1) Medical services are needed because of a medical
emergency;
(2) Medical services are needed and the beneficiary's
health would be endangered if he were required to
travel to his State of residence;
(3) The State determines, on the basis of medical
advice, that the needed medical services, or necessary
supplementary resources, are more readily available in
the other State;
(4) It is general practice for beneficiaries in a
particular locality to use medical resources in another
State.

"When an agency interprets its own regulation, the Court,
as a general rule, defers to it unless that interpretation is
plainly erroneous or inconsistent with the regulation." Decker
v. Northwest Envtl. Defense Ctr., 133 S. Ct. 1326, 1337 (2013)
(internal quotation marks omitted).  The agency's interpretation
need only be permissible and "need not be the only possible
reading of a regulation—or even the best one—to prevail." Id.
The agency's interpretation is strengthened when "there is no
indication that [the agency's] current view is a change from
prior practice or a post hoc justification adopted in response
to litigation." Id.  On the other hand, the court will not
defer to the agency's interpretation if "an alternative reading
is compelled by the regulation's plain language or by other
indications of the Secretary's intent at the time of the

34

regulation's promulgation."  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).

The dispute over the meaning of § 431.52(b) boils down to its purpose:  whether the regulation governs the rate of payment or the provision of services.  D-H asserts that the regulation requires Vermont to pay for services provided by D-H "to the same extent" that Vermont would pay for services provided by hospitals in Vermont.  D-H further interprets "to the same extent" to mean "at the same rate."

D-H further notes that § 1396a(a)(16) refers to a "State plan for medical assistance" and that "medical assistance" is defined by § 1396d(a) to mean payment of the cost of care and services.  D-H reasons that § 1396a(a)(16), therefore, requires payment of the costs of care and services for beneficiaries who are outside the state.  Based on that requirement and the purpose of Part 431 which includes payment for out-of-state services, D-H interprets § 1396a(a)(16) and its implementing regulation, § 431.52(b), to pertain to payment for services rather than to provision of services.

The federal defendants assert that § 1396a(a)(16) and § 431.52(b) focus on Medicaid beneficiaries and ensure that certain services will be provided to beneficiaries when they are in another state.  They interpret § 431.52(b) to govern what

services are covered for beneficiaries in another state; that
is, what services will be paid for by Medicaid.  As such, they
read the phrase "that the State will pay for services furnished
in another State to the same extent that it would pay for
services furnished within its boundaries" to mean that a
beneficiary will be entitled to the same Medicaid services when
he or she is in another state, as long as the listed conditions
are met.

Both interpretations of § 431.52(b) are plausible.  D-H has
not shown, however, that its interpretation of § 431.52(b) is
compelled by the language of the regulation or by any history
pertaining to promulgation of the regulation.  In contrast, the
explanation provided by the federal defendants persuasively
shows that § 431.52(b) governs what services are covered for
Medicaid beneficiaries when they are outside the state, not what
rates of payment will be made for those services.  Further, the
federal defendants point out that § 431.52(b) has been
interpreted consistently not to require state Plans to provide
equal payments to in-state and out-of-state providers.[10]

Therefore, applying the deference required for HHS's
interpretation, the court concludes that § 431.52(b) governs

---

[10] The federal defendants represent that other states' Medicaid
Plans, which have been approved by CMS, also include the same
rate provisions that Vermont's Plan provides.

coverage and does not require specific rates for payments to out-of-state providers.

### (4) 5 U.S.C. § 706(2)(A)

D-H alleges that the approvals of amendments to the Vermont Plan by HHS and CMS must be set aside under § 706(2)(A) because they are arbitrary, capricious, and in violation of § 431.52(b). Based on the court's interpretation of § 431.52(b), the actions of HHS and CMS are not arbitrary, capricious, or contrary to law.  Therefore, the court does not find that the approvals of the amendments to Vermont's Plan must be set aside based on a violation of § 431.52(b).  The claim in Count V is dismissed.

### Conclusion

For the foregoing reasons, Vermont's motion for judicial notice (document no. 18) is denied.  The federal defendants' motion to dismiss (document no. 15) is granted on Count V and is otherwise denied.  Vermont's motion to dismiss (document no. 17) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 2, 2016

cc:  Jon T. Alexander, Esq.
     Gerard J. Cedrone, Esq.

Kristin L. Clouser, Esq.
Anthony J. Galdieri, Esq.
John Paul Kacavas, Esq.
Gordon J. MacDonald, Esq.
Katherine Amestoy Martin, Esq.